McCRERY ET UX.

*v.*

NIVIN ET AL.

(Court of Chancery of Delaware. Aug. 12, 1907.)

*Anthony Higgins* and *Horace Greeley Eastburn,* for complainants. *Howell S. England* and *A. M. Holding,* for respondents.

NICHOLSON, Chancellor: Upon the bill of complaint filed in this cause a rule was issued, directed to the said Septimus E. Nivin, trustee as aforesaid, and Harry I. Gillis, sheriff of New Castle county, requiring them to show cause why a preliminary injunction should not be granted restraining them from selling two certain lots situated in the city of Wilmington, with dwelling houses erected thereon, belonging to the said Jesse B. McCrery, one of the complainants; the said lots having been advertised to be sold by the said Harry I. Gillis, sheriff as aforesaid, on the 27th day of November, 1905, under and by virtue of a writ of venditioni exponas caused to be issued by the said Septimus E. Nivin after he had caused a writ of fieri facias to be issued upon a judgment for $2,000, with interest thereon from June 30, 1886, which was entered under a warrant of attorney contained in a bond for $2,000 accompanying a mortgage which had been given by Nancy McCrery and Jesse B. McCrery, her husband, the said respondents, to one Joseph Wiley on the said 30th day of June, A.D. 1886, and which were assigned on the same day by the said Joseph Wiley to William McCullough, trustee under the will of Dr. Hayes, and afterwards were assigned to the said Septimus E. Nivin, trustee as aforesaid, by Elmina F. McCullough, widow and executrix of the said William McCullough. This bond and the accompanying mortgage were given to the said Joseph Wiley to secure a part of the purchase money of a certain mill property situated in

the township of Lower Oxford, in the county of Chester, and state of Pennsylvania; the consideration named in the deed being $3,500, of which the sum of $1,000 was paid in cash by the said Nancy McCrery, and the balance secured by the above mentioned bond and mortgage for $2,000 and another bond and mortgage for $500 constituting a second lien. Pending the hearing and determination of the rule to show cause why a preliminary injunction should not be granted, a restraining order was issued. At the return of the rule a hearing was had upon bill, answer, affidavits, and exhibits, and the issues involved, both of law and fact, were thoroughly argued by counsel for the respective parties.

In many respects the case is a hard one, and I have considered every fact and circumstance presented, as well as every question raised by counsel, with extreme care and deliberation. The complainants base their claims for relief in this court upon three distinct grounds, which are stated in the brief of their solicitors in the following language: "(1) Because the complainants were discharged and released from the payment of the mortgage debt by William McCullough, trustee, who owned the bond and mortgage at the time of the sale of the property to Morton in 1891. This discharge is clearly established by the affidavit of Mr. McCrery and of Mrs. Mc-Cullough, and by the sworn statement of Mrs. Morton, administratrix of Joseph Morton, in the orphans' court proceeding above referred to. (2) Because of the bargain made by Nivin with Timoney to extend the time of the payment of the mortgage for $2,000, and to allow it to remain on the property at the rate of 5 per cent. per annum, in consideration of Timoney's purchasing the property at the orphans' court sale on November 16, 1896; Nivin at this time having full knowledge of the fact that the Mortons owned the property and admitted the debt as their own. (3) Because of the gross negligence of Nivin in allowing the machinery and fixtures to be sold and removed from the mill premises, and in allowing the property generally to become wasted and destroyed, whereby the security for the debt was wholly wasted and lost." Before considering these contentions it will be well to state briefly the principal undisputed facts in the case, although it may involve some repetition.

The mill property above described was conveyed to the above-named Nancy McCrery by one Joseph Willey on the 30th day of June, A.D. 1886, and on the same day the bond and mortgage for $2,000 executed by the said Jesse B. McCrery and Nancy McCrery were assigned to William McCullough, trustee under the will of Dr. Hayes, late of West Chester, Chester county, Pa., and the bond and mortgage for $500 to McCullough individually. The mill was improved and used by the complainants until the 26th day of March, A.D. 1891, when it was sold and conveyed unto Joseph Morton for the consideration of $3,500, of which consideration the sum of $1,000 was paid in cash, and the two mortgages above described, the first for $2,000 and the second for $500, remained as liens upon the property. After the sale of the property the complainants removed to the city of Wilmington, and, believing themselves relieved from any obligation for the payment of the $2,500 resting upon the property, never revisited the mill nor made any inquiries about its condition, nor were they in any way reminded of the existence of the obligations they had entered into until foreclosure proceedings were instituted in Chester county in 1905, and they were notified by the said Septimus E. Nivin, one of the respondents. In 1895 Joseph Morton, the grantee of the mill property, died, and in November of the same year the widow sold the mill property as executrix under an order of the orphans' court for the payment of his debts. It was sold to one Dennis Timoney for $3, subject to the said $2,000 mortgage and its accumulated interest, amounting to $250, but discharged from the lien of the $500 mortgage; a prior order of the court to sell subject to both mortgages having been returned, "Property unsold for want of bidders." William McCullough had died in April, 1892, and in September, 1892, Elmina F. McCullough, his widow and executrix, had assigned the $2,000 bond and mortgage, together with other securities belonging to the estate of the said Dr. Hayes, to the said respondent, Septimus E. Nivin, who had been appointed by the orphans' court of Chester county trustee of the estate of the said Dr. Hayes, successor to the said William McCullough. After the property was sold to Dennis Timoney it was suffered to fall into such dilapidation and decay that when it was sold in 1905 it was bought in by Timoney for the sum of $101, a price but little below its real

value at that time, as alleged in the bill of complaint and not denied. Immediately after the sale judgment was entered against the complainants on their $2,000 bond, accompanying the mortgage, in New Castle county, Del., as already described for the purpose of collecting from them the deficiency. The rate of interest specified in the bond and mortgage was 6 per cent., but was subsequently reduced to 5 per cent. by the said trustee, Septimus E. Nivin, and, as alleged in the answer and not denied by complainant, was paid throughout the whole period with reasonable promptness.

The alleged release of the mortgagors, which constitutes the complainant's first ground for relief is denied in the answer. In the seventh paragraph of the bill, complainants allege that the said William McCullough, who held the said bonds and mortgages by assignment as aforesaid, "released and discharged the complainants from any liability on the same; he being then and there satisfied to accept, and then and there considering, the said mill property as ample security for the payment of the said bonds and mortgages." In the eighth paragraph it is alleged that one Benjamin F. Taylor, a real estate agent, had negotiated the sale "and assisted in the transactions in relation thereto with the said Morton and with the said William McCullough." Complainants allege that, as they were about to remove to the city of Wilmington, they "left the matter of having themselves properly released and discharged from the said obligations entirely in the hands of the said Benjamin F. Taylor." An affidavit of Jesse B. McCrery was filed in support of these general allegations of the bill; but, instead of being more specific, it seems to admit that his knowledge of any release by William McCullough rested solely upon the statements of the said real estate agent, Benjamin F. Taylor. After reciting that an agreement had been entered into by Morton, which contained a clause relating to the assumption of the debt by Morton and the release of the mortgage by McCullough, the affidavit proceeds as follows: "When the said Benjamin F. Taylor returned from West Chester he notified deponent that he had seen the said McCullough, and the said McCullough stated he was perfectly satisfied to have the property sold to Morton, and that he would allow the money secured by the said two bonds and mortgages re-

main on the property, and agreed to discharge deponent and his wife from any further liability on said bonds and mortgages, and to look only to the said mill property and to the said Morton alone for the payment of the same."

McCrery's affidavit contains nothing further to indicate that he had any personal knowledge of such an agreement to release, but intimates that he believed that a release was indorsed upon the bond. Nor does the affidavit of Mrs. McCullough contain any allegation of personal knowledge of the existence of any release by McCullough, or any agreement on the part of Morton to assume the mortgage. In fact, Mrs. McCullough expressly alleges that "she was not present at the time the alleged agreement was made, between the said William McCullough, the said Morton, and the McCrerys, that the said McCullough would look to the said Morton for the payment of the said two bonds and mortgages, as in said bill of complaint set forth." The agreement for the sale of the property, which was produced at the hearing of the rule as an exhibit, contained no clause relating to the assumption of the debt by Morton, or any proposed release of the McCrerys by McCullough; nor did the bond contain any such indorsement as was intimated, or believed to exist by the said Mc-Crery, or, indeed, any indorsement, except that of the payment of interest. In short, there appears to be such a total failure of proof that it seems hardly necessary to consider this branch of the complainants' case further. It is true that lenders of money upon bonds and mortgages usually lend upon their estimate of the value of the mortgaged premises, and in making such loans rarely consider the right of resort to the personal obligation of the mortgagor, so that it may well be that Morton would have been willing to assume the debt, and William McCullough would have been willing to execute a release, had they been requested so to do by the McCrerys or their agent; but there is no evidence before me from which I could infer the fact of an actual assumption or of a release.

The counsel for the respondents make an exhaustive reply in their brief to this claim of complainants, considering in detail every shred of evidence on either side which might, by any construction, bear upon this point; but, in view of the practically complete failure

of proof on the part of the complainants, I will refer to but a single point, which would seem to be conclusive. He contends, correctly, that "whether a valid assumption or agreement upon the part of Morton to pay the indebtedness secured by said bond and mortgage was made depends upon the law of the state where such contract or release is alleged to have been made"—citing *Scudder v. Bank,* 91 *U.S.* 406, 23 *L.Ed.* 245; 1 Jones on Mortgages, § 656; *Scott v. Duffy,* 14 *Pa.* 18; *S.G. Bldg. Ass'n v. Stockton,* 148 *Pa.* 146, 23 *Atl.* 1063— and then quotes from the laws of Pennsylvania, where the said contract or release is alleged to have been made, the following act, passed in 1878: "Section 1. Be it enacted, etc., that grantee of real estate which is subject to ground rent or bound by mortgage or other encumbrance, shall not be personally liable for the payment of such ground rent, mortgage or other encumbrance, unless he shall, by an agreement in writing, have expressly assumed a personal liability therefor, or there shall be express words in the deed of conveyance stating that the grant is made on condition of the grantee assuming such personal liability: Provided, that the use of the words 'under and subject to the payment of such ground rent, mortgage or other encumbrance,' shall not alone be so construed as to make such grantee personally liable as aforesaid." *P.L.* 205; *Wunderlich v. Sadler,* 189 *Pa.* 469, 42 *Atl.* 109.

In concluding the discussion of this branch of complainants' case, it is assuredly not necessary to discuss the contention of complainants' solicitors that the assumption of the mortgage by Morton is proved by the fact that his widow and executrix included it in the list of his debts in her petition to the orphans' court for the sale of land to pay debts. It is too obvious that no rights or obligations of others can be thus affected.

This brings me to the complainants' second contention, as above quoted from the brief of their solicitors, to which the greater part of their brief is devoted. If it should appear that the facts stated in this paragraph of their brief have been alleged in the bill and sustained by proof against the denial of the respondents, the legal questions raised are of such importance and difficulty as to require careful

consideration and lengthy discussion. When a mortgagor conveys the mortgaged premises, and the grantee assumes the mortgage, the law governing the relations of mortgagor, mortgagee, and grantee is fully stated by Pomeroy in his work on Equity Jurisprudence, as follows: "The assumption produces its most important effect, by the operation of equitable principles, upon the relations subsisting between the mortgagor, the grantee, and the mortgagee. As between the mortgagor and the grantee, the grantee becomes the principal debtor primarily for the debt, and the mortgagor becomes a surety, with all the consequences flowing from the relation of suretyship. As between these two and the mortgagee, although he may treat them both as debtors, and may enforce the liability against either, still, after receiving notice of the assumption, he is bound to recognize the condition of suretyship, and to respect the rights of the surety in all of his subsequent dealings with them. Payment, therefore, by a grantee who has assumed the entire mortgage debt, completely extinguishes the mortgage. He cannot be subrogated to the rights of the mortgagee, and keep the mortgage alive for any purpose. While the mortgagee may release the mortgagor without discharging the grantee, his release of the grantee, or his valid extension of the time of payment to the grantee, without the mortgagor's consent, would operate to discharge the mortgagor. In short, the doctrines concerning suretyship must control the dealings between these three parties. When land is thus conveyed, with an assumption of a mortgage by the grantee contained in the deed, subsequent grantees holding under the conveyance are charged with notice, and the land continues to be the primary fund for payment, as though the fact were recited in their own deeds." *Pom. Eq. Jur* (*2d Ed.*), pp. 1845-1847, § 1206, and notes, containing a full list of authorities upon which the text is based.

In the present case, as already shown, it cannot be held that there was any express assumption of the mortgage by the grantee; but the grantee took the land subject to the mortgage, the amount of which was deducted from the purchase money. In such cases the view taken of the law governing the relations of mortgagor, grantee, and mortgagee by the courts of New York is fully stated by Finch, J.,

who delivered the opinion of the court in the case of *Murray et al. v. Marshall*, 94 *N.Y.* 611, 615, as follows: "While, as we have said, no strict and technical relation of principal and surety arose between the mortgagor and his grantee from the conveyance subject to the mortgage, an equity did arise, which could not be taken from the mortgagor without his consent, and which bears a very close resemblance to the equitable right of a surety, the terms of whose contract have been modified. We cannot accurately denominate the grantee a principal debtor, since he owes no debt, and is not personally a debtor at all; and yet, since the land is the primary fund for the payment of the debt, and so his property stands specifically liable to the extent of its value in exoneration of the bond, it is not inaccurate to say that as grantee, and in respect to the land, and to the extent of its value, he stands in the relation of a principal debtor, and to the same extent the grantor has the equities of a surety. This follows inevitably from the right of subrogation which inheres in the original contract of sale and conveyance. It is a definite and recognized right, which, in the absence of an express agreement, will be founded upon one implied. *Gans v. Thieme*, 93 *N.Y.* 232. When the mortgagor in this case sold expressly subject to the mortgage, remaining liable upon his bond, he had a right, as against his grantee, to require that the land should first be exhausted in the payment of the debt. Presumably the amount of the mortgage was deducted from the purchase price, or at least the transfer was made and accepted in view of the mortgage lien. Seller and buyer both acted upon the understanding that the land bound for the debt should pay the debt as far as it would go, and their contract necessarily implied that agreement. Through the right of subrogation the vendor could secure his safety, and that right could not be invaded with impunity. It was invaded. When the creditor extended the time of payment by a valid agreement with the grantee, he at once, for the time being, took away the vendor's original right of subrogation. He suspended its operation beyond the terms of the mortgage. He put upon the mortgagor a new risk, not contemplated, and never consented to. The value of the land, and so the amount to go in exoneration of the bond, might prove to be very much less at the end of the extended period than at the original maturity of the debt, and the latter might

be increased by an accumulation of interest. The creditor had no right thus to modify or destroy the original right of subrogation. What he did was a conscious violation of this right; for the fact that he dealt with the grantee for an extension of the mortgage shows that he knew of the conveyance and that it left the land bound in the hands of the grantee. Knowing this, he is chargeable with knowledge of the mortgagor's equitable rights, and meddled with them at his peril. But it does not follow that the vendor was thereby wholly discharged. The grantee stood in the quasi relation of principal debtor only in respect to the land as the primary fund, and to the extent of the value of the land. If that value was less than the mortgage debt, as to the balance he owed no duty or obligation whatever; and so to that the mortgagor stood to the end, as he was at the beginning, the sole principal debtor. From any such balance he was not discharged, and as to that no right of his was in any manner disturbed. The measure of his injury was his right of subrogation, and that necessarily was bounded by the value of the land. The extension of time, therefore, operated to discharge him only to the extent of that value. At the moment of the extension his right of subrogation was taken away, and at that moment he was discharged to the extent of the value of the land, since the extension barred his recourse to it, and, once discharged, he could not again be made liable. From that moment the risk of future depreciation fell upon the creditor, who by the extension practically took the land as his sole security to the extent of its then value and assumed the risk of getting that value out of it in the future. But the Special Term went further, and held that the mortgagor was absolutely discharged by the extension. That might or might not be, and depended upon the question whether the value of the land equaled or fell below the debt. For, conceding the general rule that the surety is discharged utterly by a valid extension of the time of payment, and that the mortgagor stands in the position and has the rights of a surety, it must be steadily remembered that he can only be discharged so far as he is surety, that he holds that position only up to the value of the land. and beyond that is still principal debtor without any remaining equities."

In *Spencer v. Spencer*, 95 *N.Y.* 358, Ruger, C.J., who delivered the opinion of the court, refers to the above case as follows: "We recently decided, in the case of *Murray v. Marshall*, that the grantor of real estate, who had conveyed the same subject to the payment of a mortgage, occupied to the extent of the value of the land the position of, and was entitled to the same rights as, a surety, and, when the holder of the mortgage had by a valid contract with the owner of the equity of redemption postponed the time for its payment beyond the time therein provided, he had so impaired the equitable rights of the mortgagor as to discharge him from liability to the extent of the value of the land mortgaged."

This extremely interesting question has never been passed upon by the courts of Delaware or Pennsylvania, and only after an exhaustive examination of the law of mortgage in those states would it be possible to determine whether the reasoning of the New York courts would apply and their conclusions be adopted either within my own jurisdiction or in that of the Pennsylvania courts. In the determination of the question, I should, of course be governed by the laws of Pennsylvania, as is the contention of the solicitors for the respondent. I have considered it both desirable and proper for me to make this statement of the questions of law raised by the complainants' counsel in advance of determining whether the pleadings, affidavits, and exhibits upon which the rule was argued establish the fact that there was any valid agreement on the part of the mortgagee with the grantee of the mortgaged premises to extend the time of payment.

The only allegations upon this point contained in the bill are as follows:

Paragraph 14: "* * * That your complainants are further informed and believe that because of the difficulty in collecting the said interest from the said Morton, to wit, on or about the 26th day of April, 1894, the said Septimus E. Nivin demanded payment of the said sum of $2,000 secured by the said bond and mortgage for that amount of the said Morton, and that he thereafter agreed with the said Joseph Morton to extend the time of payment of the said debt in consideration that the said Joseph Morton would pay him interest

thereon at the rate of 5 per cent. per annum, and that thereafter, and until the time of the entering of the judgment in the Superior Court of New Castle county as aforesaid, the said Joseph Morton, until the time of his death as aforesaid, and the said Dennis Timoney from on or about April 7, 1896, paid interest at the rate of 5 per centum per annum on the said bond and mortgage to the said Septimus E. Nivin, trustee as aforesaid; that the complainants had no knowledge of this said agreement to extend the time of payment of the said debt of $2,000 until many years thereafter, to wit, until after the entering of the said judgment in the Superior Court of New Castle county, as aforesaid, and did not consent thereto."

Paragraph 15: "Complainants are informed, believe, and aver that the said Septimus E. Nivin, trustee as aforesaid, demanded payment of the said bond and mortgage for $2,000 of the said Joseph Morton several times during the year 1894, and after his death, during the year 1905, demanded payment thereof of Jane Morton, the administratrix of the said Joseph Morton, and that he, after such demands, extended the time of payment of the said bond and mortgage to the said Joseph Morton and his said administratrix, in consideration of their paying to him 5 per cent. interest thereon per annum; that the said Septimus E. Nivin, trustee as aforesaid, during the year 1896 and at various times thereafter, as complainants are informed and believe, demanded payment of the said bond and mortgage for $2,000 of the said Dennis Timoney, and at various times during the period that the said Timoney owned the said mill property extended the time for the payment of the said bond and mortgage, at his request and in consideration of his paying interest thereon at the rate of 5 per cent. per annum; that all of these said extensions for the time of payment of the said bond and mortgage were made without the knowledge or consent of the complainants."

To these allegations the answer of Septimus E. Nivin, one of the respondents, replies, as follows, in paragraph 14:

"* * * Defendant also denies that, because of the difficulty of collecting interest on said debt from said Morton, as alleged by complainants, or for any other reason, he demanded payment of the prin-

cipal of said debt from said Morton and agreed with him to extend the time of the payment thereof, or that he either made such demand or agreed to such extension for any consideration whatever. Defendant did, some years ago, reduce the interest on said debt from 6 per cent. to 5 per cent., but not for any such reason or upon any such consideration as complainants allege, but simply because, when such reduction in interest was made, the current rate of interest in Chester county, Pa., upon such loans, was 5 per cent., and defendant thought that in fairness that was as much interest as ought to be exacted for this loan. Such reduction in no way injured complainants."

Paragraph 15: "Defendant denies all of the averments made in paragraph 15 of complainant's bill. * * *"

It is also alleged in several affidavits that at the time of the sale of the mill property under the order of the orphans' court it was announced by Nivin, or some one, that the mortgage would be allowed to remain upon the property. It is denied by the affidavit of Mr. Nivin that he made any such announcement, and he avers that, the property having been sold under the order of the orphans' court subject to the mortgage, it was so stated by his counsel, who was present at the sale. It is manifest, from the mere statement of these allegations, that no valid extension of time within the meaning of the law is even alleged, much less proved; that is, a valid contract to extend payment for a definite period, and not a mere forebearance. It follows, therefore, that there are no facts before me to sustain the second contention made by the complainants' solicitors; and it is not only unnecessary, but would be improper, for me to enter into a discussion of the questions of law I have stated above.

The last contention of the complainants cannot be seriously considered; the law of mortgage being too well settled for me to discuss the claim that negligence on the part of the mortgagee to look after the condition of the mortgaged premises, or his delay in foreclosing the mortgage, when not requested to foreclose by the mortgagor, could release the mortgagor. The case of the complainant Jesse B. McCrery is a hard one, and the absolute indifference of the holders of the bond and mortgage to the condition of the mortgaged prop-

erty, although residing within a few miles of it, has resulted in disaster to him as a mortgagor; but it is manifest, from the whole case as presented to me by the affidavits and exhibits to which I have not deemed it necessary to refer, as well as by those I have discussed, that the complainants' ignorance of the law and their implicit confidence in an agent are the real causes of their calamity, and that the case presented to me is one in which a court of equity has no power to relieve from the harsh incidents of settled rules of law.

The motion for a preliminary injunction must be refused, the rule discharged, and the restraining order heretofore issued dissolved. Let an order be entered accordingly.