EQUITABLE TRUST COMPANY, a corporation of the State of Delaware, Executor of and Trustee under the Will of W. Miller Shaw, Deceased,

*vs.*

CLARA E. SHAW, BENJAMIN F. SHAW, II, W. MILLER SHAW, JR., ROBERT F. SHAW, HELEN ELIZABETH HAGERMAN and HUNTER GRUBB SHAW.

*New Castle, May 31, 1937.*

*Howard Duane,* for complainant.

*John J. Morris, Jr.,* of the firm of Hering, Morris & James, and *Thomas H. Wingate,* for defendants, Clara E. Shaw, Benjamin F. Shaw, 2d, and Helen Elizabeth Hagerman.

*Benjamin N. Brown,* for guardian of W. Miller Shaw, Jr., and of Robert F. Shaw.

*Clarence A. Southerland* and *Paul Leahy,* of the firm of Ward & Gray, for guardian of Hunter Grubb Shaw.

THE CHANCELLOR: The question in this case arises under the will of W. Miller Shaw, deceased, who died testate on September 3, 1930, possessed of a parcel of real estate with a dwelling thereon erected in Margate City, Atlantic County, New Jersey, and of considerable personal property.

By his will, he devised to his wife, Clara E. Shaw, "all my interest in real estate of whatsoever nature and wherever situate."

The New Jersey property was purchased by the decedent on February 19, 1927, from Seaview Corporation, a New Jersey corporation, for the sum of $33,500.00. By the written agreement of sale dated February 9, 1927, the deceased agreed to pay the consideration money as follows: $1,000.00 in cash upon the signing of the agreement, $15,000.00 by the assumption of a mortgage in that amount then existing on the property, and $17,500.00 in cash at the time of settlement.

The mortgage had been placed on the property by one Campbell and wife, grantors presumably of Seaview Corporation, to secure a bond in like amount. The mortgage was dated October 27, 1926, and was payable on October 27, 1929.

Shaw paid the cash consideration of $18,500.00 called for by the agreement and took title to the property by deed duly executed and delivered on February 19, 1927, subject to the mortgage.

On October 29, 1929, the mortgage being two days over due, the mortgagee, Chelsea Title & Guaranty Company, a corporation of New Jersey, entered into an agreement under seal with Shaw, in and by which the mortgagee extended the due date of the mortgage for three years from October 27, 1929, stipulating that it would not demand payment before the expiration of the extended period. This extension was recited in the agreement as having been requested by Shaw, who agreed on his part not to make or tender payment of the principal until after the expiration of the three year period of extension. Shaw further agreed as follows:

"The party of the second part hereby guarantees, assumes, and covenants to make prompt payment of the interest and principal of said bond so secured, together with all taxes and water rents assessed, and to maintain the fire insurance, as aforesaid."

The parties further stipulated that all the terms, etc., contained in the original bond and mortgage not inconsistent with the extension agreement, should remain in full force and effect.

On the foregoing state of facts, Mrs. Shaw has demanded that the executor of her husband's estate shall pay off the mortgage from the personal property in its hands for administration, the same being more than ample for that purpose after all other charges are liquidated.

The question, then, which the bill presents is whether

or not the personal estate of the deceased is, under the facts shown, bound to exonerate the land devised to Mrs. Shaw from the lien of the mortgage.

If the mortgage had been given by the deceased to secure the payment of his own bond, the liability of the personal estate to pay it in exoneration of the mortgaged land cannot be doubted. *Cooch's Ex'r. v. Cooch's Adm'r.*, 5 *Houst.* 540, 1 *Am. St. Rep.* 161, decided by the old Court of Errors and Appeals of this State, firmly establishes that proposition.

And such is the prevailing rule of the law generally, except where statutes have declared otherwise. Such a statute has been enacted in New Jersey, where the real estate devised to Mrs. Shaw is located. See *New Jersey Laws*, 1924, *ch.* 164 (*Comp. St. Supp.* 1924, § 134—46a). By that statute it is provided in substance that when land subject to a mortgage passes by descent or devise, the heir or devisee shall take the land *cum onere* without right of exoneration by the personal estate, unless the will provides otherwise.

The first question to be answered is whether or not the circumstance that the land is located in New Jersey requires that the rule of the New Jersey statute shall be applied to the administration of the estate here. If so, of course, the case is at an end, for the statute is plain and there is nothing in the will indicating a direction contrary to its rule.

It is to be observed that the decedent was a life long resident of Delaware. His will was executed here. The real estate in New Jersey was purchased by him as a summer dwelling near the ocean. If he had the law of either state, Delaware or New Jersey, in mind when he wrote his will, and therefore meant his intent to be colored by the law of any particular jurisdiction, we must in reason infer that

it was the law of Delaware rather than that of New Jersey which was present in his mind. *Wharton, Conflict of Laws,* (3*d Ed.*) *vol. 2, p.* 1336; 1 *Alexander, Commentaries on Wills,* § 272, *p.* 334.

The question here is one that is concerned with the administration of a decedent's estate in this jurisdiction. It is not one that necessitates an adjudication of the title to real property located in New Jersey. If it were, this jurisdiction would be without authority to determine it. The bill merely presents a question propounded by the executor of how, in administering the estate of the deceased, the personal estate should be applied under the law of this State where it is located and where the accountability for its disposition is to be determined.

This being the nature of the case, it does not seem to me to admit of doubt, that the question is to be answered in the light of Delaware law and without regard to the New Jersey statute. *Higinbotham v. Manchester,* 113 *Conn.* 62, 154 *A.* 242, 79 *A. L. R.* 85.

There is no statute in this State similar to that which is found in New Jersey and elsewhere of the character above described. The question which the case propounds is therefore one which lies in the field of decisional law uninfluenced by statutory rules.

As before noted, where a mortgage was given by the deceased to secure his own obligation, the right of the land to be exonerated by the personalty is firmly settled, in the absence of testamentary direction to the contrary. But the *sine qua non* of the principle's application is that the debt which the mortgage secures must be the personal obligation of the deceased. Hence the general rule is that if the deceased was the grantee of land subject to the incumbrance of a mortgage placed thereon by his grantor to secure the latter's debt, the heir or devisee takes the land *cum onere*

and, if the facts show no personal obligation of the deceased of a direct and primary character, his personal estate is under no duty of exoneration. In the leading case of *Duke of Cumberland v. Codrington,* (1819) 3 *Johns. Ch.* (*N. Y.*) 229, 8 *Am. Dec.* 492, Chancellor Kent exhaustively reviewed the authorities; and the principles he announced as the law have ever since been accepted by the courts as controlling, except of course where statutes have declared otherwise.

The question in such cases as this, as is shown by Chancellor Kent in the case from 3 *Johns. Ch.* is one of intention on the part of the testator. When a purchaser acquires an estate encumbered by an existing mortgage and agrees to assume the mortgage, he of course by his agreement of assumption undertakes a financial obligation. On his death a question is apt to arise, as it frequently has, between his heir or devisee on the one hand and his administrator or executor on the other, as to the nature of the obligation—whether it is the debt primarily of the land, so to speak, or of his personal estate. Before his personal estate can be required to pay the debt, there must have been not only an intention on his part to become liable for the debt, but the intention must also appear to the court to have been such that in assuming the debt the testator meant to make it his personal debt, "detached, as it were, from the land." As put by the learned Chancellor, the question is "not merely whether the purchaser has rendered himself liable at law to a suit by the creditor, but which estate is to be deemed the primary fund (for its payment, in the event of the purchaser's death), and which only the auxiliary." After making an extended and comprehensive review of the cases then in existence, he formulated the following as the result of their holdings:

"The result of the cases seems to be that as to wills, the testator may, by express directions, charge such an encumbrance upon his personal assets, or even without express words, he may do it by dispositions and language that are tantamount; as if, for instance, the

continuance of the charge primarily on the land would be repugnant to some of the provisions in the will and defeat them. As to other acts of the purchaser in his lifetime, in order to charge his personal estate as the primary fund, he must make himself, by contract, personally and directly liable at law for the debt to the owner of the encumbrance; and even a covenant or bond for the purpose will not be sufficient, unless accompanied with circumstances showing a decided *intention* to make thereby the debt personally his own.  *  *  *

"The cases I have been reviewing, require some decided and marked act of assumption of the very debt in question, by making it a debt of primary personal obligation."

The principal English authorities dealing with this subject from which all the later decisions, both English and American, are developed and which were accepted by Chancellor Kent in *Duke of Cumberland v. Codrington, supra,* as correctly expressive of the governing principles applicable in controversies of this nature, are two cases decided by Lord Thurlow. The first was *Tweddell v. Tweddell,* (1786) 2 *Bro. C. C.* 101, 152, 29 *Eng. Reprint,* 58, 87, and the second was *Bellinghurst v. Walker,* (1789) 2 *Bro. C. C.* 604, 29 *Eng. Reprint,* 332.

In *Tweddell v. Tweddell,* the principle decided was as stated by Lord Alvaney in *Woods v. Huntingford,* 3 *Ves.* 128, that "where a man buys subject to a mortgage, and has no connection or contract, or communication, with the mortgagee, and does no other act to show an intention to transfer that debt from the estate to himself, as between his heir and executor, but merely that, which he must do, if he pays a less price in consequence of that mortgage, that is, indemnifies the vendor against it, he does not by that act take the debt upon himself personally."

In *Bellinghurst v. Walker, supra,* the principle of *Tweddell v. Tweddell* was not enlarged. It was accepted and applied to a set of facts which, at first blush, would seem to indicate that even if the purchaser dealt by contract with the incumbrancer, the debt nevertheless would not acquire

the quality of a primary obligation of the purchaser. Sir William Grant, however, in *Oxford v. Rodney*, (1807) 14 *Ves. Jr.* 417, 33 *Eng. Reprint*, 581, in analyzing these two decisions of Lord Thurlow, pointed out with that discernment and perspicacity for which he was noted, that in *Bellinghurst v. Walker*, as well as in *Tweddell v. Tweddell*, the obligation of the purchaser was to all intents and purposes simply one of security and indemnity, and in no sense a direct and primary one against his personal estate.

In the instant case, the situation of the purchaser was not that of one who has purchased a mere equity of redemption and done nothing more. Neither is it that of a purchaser who acquires title subject to a mortgage which is credited on the total purchase price and who covenants with the mortgagor to pay the mortgage, and stops there. Nor is it the case of a purchaser covenanting with the mortgagor expressly to indemnify him.

Here the, purchaser acquired the property for $33,-500.00, paying $18,500.00 in cash and assuming the existing first mortgage of $15,000.00. The purchaser's vendor was not the mortgagor. The mortgagor was vendor to the purchaser's vendor. Whether the purchaser's vendor had assumed the mortgage in his purchase from the mortgagor, does not appear. Whether, in those circumstances, the mortgagee could claim the benefit of the last purchaser's (Shaw's) assumption of the mortgage, may be open to debate.

But there is no occasion to enter the field of debate upon that question. It is rendered unnecessary by the fact that after the mortgage came due and two years and eight months after Shaw had acquired the property and had assumed the mortgage, he entered into an agreement under seal directly with the mortgagee by which he committed himself in the language quoted near the outset of this opinion. Not only so, but he agreed not to pay the prin-

cipal until after a period of three years from the date of the agreement had elapsed; and the mortgagee covenanted with him not to demand payment of the principal for a like period of three years, except in case of default in interest payments as they fell due or in the payment of taxes, water rents and insurance charges.

When this agreement was entered into, the relations of the parties concerned, viz., Shaw, his vendor, the latter's vendor—mortgagor and the mortgagee, whatever they may have been in legal contemplation before, became quite definite and fixed. I suppose no one would question the right of the mortgagee, before the agreement was made, to call upon the mortgagor, in case the land yielded too little on foreclosure to satisfy the mortgage, to make good on his bond for the deficiency. Likewise, I suppose, no one would question the right of the mortgagor to require the mortgagee to look first to the land for his money. In *McCrery v. Nivin,* (*Del. Ch.*) 67 *A.* 452, the doctrine stated by Professor Pomeroy was accepted as equitably right and just, that where a mortgagor conveys the mortgaged premises and the grantee assumes the mortgage, as between the two the grantee becomes the principal debtor and the mortgagor becomes a surety, with all the consequences flowing from the relation of suretyship. The mortgagee, after notice of the assumption is bound to recognize the condition of suretyship and to respect the rights of the surety in all his subsequent dealings with the parties. The Chancellor quoted from the second edition of *Pomeroy's Equity Jurisprudence,* § 1206, from which the foregoing sentence is taken. It is of course one of the elementary principles of the law of suretyship that if the creditor extends the enforceability of the obligation, the surety is discharged unless he has assented thereto. In the instant case no assent was given by the so-called surety, the mortgagor.

What is the application of this principle in the instant

case? It is as follows: Regardless of whether Shaw by his agreement of assumption with his immediate vendor who. was not the mortgagor, became obligated for the debt to the mortgagee, he certainly became so obligated by the agreement he made directly with the mortgagee. The mortgagee, when it received from Shaw his agreement of assumption, was as much bound in equity to regard Shaw as the principal and the mortgagor as surety as if the benefit of Shaw's assumption had flowed to the mortgagee through the medium of the mortgagor's direct grantee. If so, the agreement which the mortgagee made with Shaw for an extension of the due date of the mortgage and Shaw's agreement with it not to pay off the mortgage for a like extended period, constituted a material alteration in the terms of the contract which the law could not regard otherwise than as prejudicial to the interests of the mortgagor, the constructive surety. It would appear then that the mortgagor, by reason of that extension agreement, became relieved of all obligation to the mortgagee.

Now if that is so, it is apparent that there can be no room for the view that Shaw's obligation after he entered into the extension arrangement was secondary to that of someone else. So far did he agree that the mortgagee might look beyond the land to him personally for the debt, that in legal result he arranged with the mortgagee that not only his own vendor, if he ever was liable for it, but as well the mortgagor, disappeared from legal view as debtors in any capacity.

After the agreement of assumption with the extensions therein stipulated, I do not see how the obligation of Shaw can in any sense be considered as one that he contemplated as being collateral to and in indemnification of the mortgagor's debt. He took upon himself the status of a direct and primary obligor. No court has ever said that a purchaser subject to a mortgage must, in order to make the

debt his direct personal obligation, do so in language that is express and positive in its affirmative character. To deny that Shaw in this case clearly revealed by his acts that he meant to become primarily and personally liable for the debt which he assumed, so strong are the circumstances, would necessitate going the distance of declaring as the law that only express language of the most positive nature would suffice to reveal an intention to make the debt directly the promissor's own primary personal obligation.

A case very close in its principle to this one is the case of *Oxford v. Rodney, supra,* decided as before stated by Sir William Grant, whom Chancellor Kent ranked with Thurlow and Eldon as among the ablest of English equity judges. In that case, Sir William Grant held that, though upon the purchase of an equity of redemption the incumbrance, as between the devisee and the personal representative of the purchaser, is not the personal debt of the purchaser, even by his covenant to pay, which is considered as only for indemnity of the vendor, it is his personal debt, if he enters into a new contract with the mortgagee, as for different times and modes of payment. See, also *In re Hunt, Petitioner,* 19 *R. I.* 139, 32 *A.* 204, 61 *Am. St. Rep.* 743. The case *sub judice* is even stronger in favor of the devisee than was *Oxford v. Rodney,* for here all the elements of *Oxford v. Rodney,* are present and more; for here we find what was absent in that case, viz., that the purchaser in his new contract agreed that he would not pay off the debt until three years had expired after the original due date.

I have examined all the cases cited in opposition to the claim of the devisee that the land devised to her should be exonerated of the mortgage by the personal estate, and I find none of them to be at odds with her contention. One of those cases rests on a statute and for that reason is of no value. The others are cases where the court found from the facts that the indemnifying character of the purchaser's

assumption was not negatived. Where the assumption agreement is made with the vendor-mortgagor, it is apparent that the case is different from one where it is made with the mortgagee. Indeed, Chancellor Kent in *Duke of Cumberland v. Codrington, supra,* makes the general remark that the assumed debt can never become primary against the purchaser unless the contract is made with the mortgagee; and he further observed that even in those cases where there is a covenant to pay, made by the purchaser with the mortgagee, still there must be something more than that mere circumstance in the dealing with the mortgagee, to show an intention to shift the primary obligation from the real to the personal fund.

In the instant case, I am of the opinion that that "something more" is clearly to be found in the new terms of the extension agreement.

Decree in accordance with the foregoing.