MALLIS et al. *v.* FARACLAS

[No. 312, September Term, 1963.]

110

*Decided May 29, 1964.*

*Motion to tax costs filed June 26, 1964, granted August 3, 1964.*

The cause was argued before Brune, C. J., and Hammond, Prescott, Marbury and Sybert, JJ.

*Frank T. Gray,* with whom was *William L. Balfour* on the brief, for the appellants.

*Konstantine J. Prevas* for the appellee.

Prescott, J., delivered the opinion of the Court.

This case stems from interfamily acrimony, which arose from certain "extramural" activities of the appellee, John E. Faraclas (John). *Faraclas v. Faraclas,* 234 Md. 337. John instituted this action against Michael N. Mallis, his brother-in-law, and other parties who are not affected by the decree of the court below, and, therefore, are not interested in the present appeal. John alleged that Michael had wrongfully appropriated $12,000 of funds belonging to a partnership of John and Michael in order to release certain collateral belonging to Nick Mallis, the father of Michael and the father-in-law of John. Michael answered by denying that he had wrongfully appropriated any partnership funds and asserting that he had utilized the $12,000 of partnership funds to secure the release of Nick's collateral, because he and John were jointly obligated to Nick to secure such a release. After a hearing below, the trial judge found that Michael had misappropriated $12,000 of partnership funds, and directed him to pay $12,000 to the partnership to be distributed equally between him and John. This appeal followed.

The record discloses that John and Michael have engaged in various business enterprises together. Among their ventures is a partnership known as Mallis Enterprises, in which (for the purposes of this case) they are sole and equal partners. They

received substantial amounts of their interest in Mallis Enterprises and other family businesses by gifts from Nick (Nick stated this amount was in the neighborhood of $250,000).

In 1955 or 1956, John and Michael participated in the formation of a new corporation named Mischanton's, Inc., which was created to operate a restaurant. John and Michael each owned 26 per cent of the stock, which gave them together control of the corporation. (The ownership of the remaining stock is not material to our decision herein.) The company had only $1,000 of paid in capital, and everyone connected with the venture realized that substantial borrowing would be necessary before the restaurant could be put into operation, because a well-equipped establishment was anticipated calling for an expenditure of nearly $200,000.

John and Michael pledged about $40,000 of the assets of Mallis Enterprises to various banks to secure loans to the new corporation. Among other assets pledged were two bank accounts, each in the amount of $3,750, one being in the names of John and his wife and the other being in the names of Michael and his wife. At the trial, John claimed that these accounts were individual, not partnership, assets. However, the trial judge found as a fact that these accounts were partnership assets and there has been no appeal from that ruling. In addition to the collateral pledged by Mallis Enterprises and John and Michael, the other stockholder of Mischanton's, Inc., put up their own collateral to the extent that they were able. Nick Mallis had no financial interest in the new corporation, but was made its president to increase its credit prestige. He never took any active part in the operation of the company.

At this point, the testimony becomes conflicting in certain of its aspects. Nick testified that he made available to John and Michael securities belonging to him of a very substantial value for use by Michael and John as collateral in securing loans to Mischanton's. Michael testified that this was done as the result of an express agreement between Nick, John and himself, whereby over a period of years Nick put up various securities to be used as collateral by John and Michael for loans to the company. He (Michael) and John agreed that after using the securities as collateral, they would return them to Nick "as soon

as we could put our business obligations in its [sic] place." John denied any express or specific agreement with Nick to return the securities. However, even his version as to why Nick permitted his securities to be pledged by John and Michael tends to support the conclusion that it was as an accommodation to them. During his cross-examination, the following colloquy took place:

"Q. You say your father-in-law put up some collateral. We know that. I am asking you what was your understanding why he did put it up. It is true he had no interest in the business, isn't that right? A. That's right.

"Q. Why would he put up collateral? A. For the same reason that everybody else put it up. So the business could start and get ahead.

"Q. Isn't it true he was interested on behalf of you and Michael since you did have an interest in it? A. Yes, he was interested, as I said, as a father-in-law of mine and as father of Michael, just like my mother in her case [John's mother furnished 100 shares of International Packers stock for use as collateral, the value of which is not shown in the record extract. Also the agreement under which she put up stock is not shown.]

In August of 1960, the previous harmonious family relationship between the Mallises and John was disrupted by domestic difficulties between John and his wife, Michael's sister. An acrimonious meeting was held by the members of the family and their attorneys, after which Nick thought his financial future was threatened. By the end of 1960, the only securities of Nick which had not been released as collateral and returned to him were certain shares of stock in the Travelers Insurance Company. Nick demanded return of all his securities which had been pledged by John and Michael, but, because assets were not then available, this was impossible. However, in April, 1961, City Vending Company, another Mallis family business, paid Mallis Enterprises $12,000, in reduction of a loan previously made to it by the partnership. Michael, who was at that time

the only active operator of Mallis Enterprises, used the payment to release Nick's collateral, and he then returned it to him. He obtained the release of the collateral by depositing $6,-000 in each of the two partnership savings accounts mentioned above, which were already pledged with the Maryland National Bank, thereby increasing the value of the pledged collateral, so that the bank was willing that Nick's collateral be withdrawn.

As we view the case at bar, it turns upon the factual question as to whether Nick made his collateral available to Michael and John as an accommodation to them, and, if he did so, upon the resulting legal rights and obligations of the parties. The trial judge made no explicit finding on the factual question, but, in the result reached, she implicitly found that Nick had not made his collateral available as an accommodation to John and Michael, for it is apparent that if Nick permitted his securities to be pledged by them as an accommodation to them, the relationship of principal and surety between the parties was created. *Restatement, Security,* § 36 (2) ; *Damler v. Baine,* 51 N. E. 2d 885 (Ind.). And John and Michael were obligated to obtain the return of Nick's pledged collateral to him, or reimburse him for loss suffered by him, if the collateral were sold by the pledgee to pay the loan secured. 72 C.J.S. *Principal & Surety,* § 300; 1 Poe, *Pleading & Practice,* §§ 111, 112, 113 and 114 (note that the learned author states that *partners* have to resort to equity to obtain contribution) ; *Blair v. Baker,* 196 Md. 242. Cf. *Damler v. Baine, supra,* and *Colonial Trust Co. v. Fid. & Dep. Co.,* 144 Md. 117. We think the record discloses that the above finding of fact was clearly erroneous. Maryland Rule 886 a.

The record makes it clear that beginning in 1956, although Nick had no financial interest in Mischanton's (as pointed out above), his securities of substantial value were pledged by John and Michael as collateral to help finance Mischanton's. From time to time, as assets became available, other collateral was substituted for some of Nick's securities and these securities were withdrawn and then returned to Nick. It is significant to note that a far greater number of Nick's securities were withdrawn prior to the family discord than thereafter. At least one such withdrawal was obtained by substituting partnership se-

curities for $16,500 worth of Nick's securities at a time (in 1957) when John testified that the parties were working harmoniously and consulting each other on all substantial matters. A pattern of withdrawal of the pledged securities and their return to Nick such as that outlined above is, we think, a clear indication that Nick permitted his securities to be pledged by Michael and John for their accommodation. The above, together with Michael's and Nick's specific testimony regarding the accommodation of Michael and John by Nick, was sufficient to establish the fact that Nick's securities were pledged as an accommodation to John and Michael. And it may be noted that in John's somewhat equivocal answers quoted above, he does not explicitly deny that the securities were made available as an accommodation, although elsewhere in his testimony, he denied there was an express agreement to that effect.

Having resolved the question of fact, we turn to the legal rights and obligations of the parties. For the purposes of the appeal, it is conceded that Michael exceeded his authority as a partner, when he used the $12,000 of Mallis Enterprise's money to secure the release of the Travelers stock, so we consider the present question in that light. The decree, as passed by the trial judge, requires Michael to bear the full burden of paying the $12,000 used to release Nick's Travelers stock, for he has already borne one-half thereof ($6,000) as a partner with a one-half interest in Mallis Enterprises, and, if he be required to pay said partnership $12,000 of his individual money, which is to be distributed one-half to himself and one-half to John, he will, in effect, have paid the full $12,000 and John will have paid nothing. (The decree provided that Michael should succeed in his individual capacity as owner of the two savings bank accounts mentioned above. But this is meaningless, since the collateral has been disposed of by the pledgee.)

The fact that Michael exceeded his authority as a partner is not dispositive of the issues involved herein. We indicated above and we now hold that John and Michael were jointly obligated to Nick to secure the return of his securities, or reimburse him for his loss, if the collateral were sold to pay the loan secured; in other words, Nick was entitled to be exonerated by Michael and John. See authorities cited above. It is well-settled law that

116

one joint obligor may claim contribution from another obligor for having discharged their mutual obligation. *Brady v. Brady*, 110 Md. 656; *Cunningham v. Cunningham*, 158 Md. 372. In the case at bar, Michael has simply used John's share of partnership funds without proper authority, but he has used them to do what John was required by law to do, *i.e., to* exonerate Nick. A wrong without attendant harm is not compensable in Maryland except by nominal damages. *Gilbert Const. Co. v. Gross*, 212 Md. 402, and cases therein cited. The appellant concedes that the appellee is entitled to nominal damages and costs in the trial court.

> *Decree reversed with costs in this Court to the appellant; and judgment entered for the appellee against the appellant for one cent, the appellant to pay the costs in the trial court.*