Samuel GELLIS et al., Plaintiffs,

v.

S. GELLIS & CO., INC., et al., Defendants.

Court of Chancery of Delaware,
New Castle.

June 21, 1974.

Lewis S. Black, Jr., Martin P. Tully, and Roger W. Arrington, of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiffs.

Edward W. Cooch, Jr., Bonnie H. Sheer, and Everett P. Priestley, Wilmington, for defendants.

BROWN, Vice Chancellor.

Plaintiffs, stockholders of S. Gellis Co., Inc. (the "Company"), have moved for summary judgment on their petition to review an annual stockholders' election of directors. The petition was brought under Section 225 of the General Corporation Law, 8 Del.C. § 225, wherein plaintiffs pray that the election of the individual defendants as directors of the Company be declared null and void and that the plain-

tiffs' slate of nominees be declared elected. This is the decision on plaintiffs' motion.

The relevant facts are not seriously disputed, although the parties do take issue with respect to the legal significance that attaches to certain events. Plaintiffs, Samuel Gellis, Kathryn Gellis, his wife, and Richard Gellis, their son ("the Gellises"), were the founders and majority shareholders of S. Gellis Co., Inc., a retail toy business which operates out of leased departments in chain stores as well as through independent outlets. Prior to July 1973, Samuel Gellis owned 269,318 shares (49.6%) of the common stock of the Company and Kathryn and Richard Gellis each owned 36,190 shares (6.7%) of the common stock.

During March 1972, Samuel and Richard Gellis, then officers and directors of the Company, informed its major creditors that the Company was unable to repay on schedule certain Company debts totalling more than six and one-half million dollars. In order to avoid bankruptcy of the Company [1] and to promote full repayment of these debts, an agreement was entered into between the Gellises and the Company's major creditors that the time for repayment be extended and that substantial control over the management of the Company be turned over to a Creditors Committee.

This agreement ("Original Extension Agreement") was executed on May 16, 1972, and provided, *inter alia,* for the following:

1. That a "Creditors Committee" plus an "Executive Committee" of its members be established for the purpose of consulting with and advising the Company and the managers and consultants designated by the Committee in the management and operation of the business;

2. That a security interest be created in all assets of the Company and its subsidiaries, subordinated, however, to the claims of trade creditors arising after April 1, 1972;

3. That the undated resignations of all of the Company's incumbent officers and directors be deposited with a designee of the Creditors Committee and that Samuel Gellis not participate actively in the business of the Company, except to the extent that consulting services might be required of him by the Committee;

4. That Samuel and Richard Gellis place certificates of stock, endorsed in blank, constituting at least fifty-one percent of the outstanding capital stock of the Company in escrow with a designee of the Committee. Absent a default, they would retain all voting rights in such stock and could, with the approval of the Committee, negotiate for its sale. Upon default, however, the Committee would have the right to cause the escrowed shares to be issued to its designee who would thereafter have the same voting rights as any other stockholder of record of the Company.

5. That a default in the agreement would occur when, among other things, there existed a negative net worth which could not be timely cured by the Gellises or the Company on demand or when the Company failed to make a scheduled installment payment to the Extending Creditors. Upon default such creditors could assume voting control of the Company as described above, and either continue its business operations or liquidate the company by enforcing their liens on company assets.

6. That the agreement would bind the parties and could not be changed, amended or modified except by a further instrument in writing signed by the party to be charged therewith.

---

1. For the fiscal year ending January 31, 1970, S. Gellis & Co., Inc., had reported earnings of $529,935; for the fiscal year ending January 31, 1971, Company earnings were reduced to $1,943; and for the fiscal year ending January 31, 1972, the Company reported a loss of $1,042.475.

In accordance with the terms of this agreement Samuel and Richard Gellis caused to be placed in escrow stock certificates, endorsed in blank, constituting 277,338 shares of the Company's outstanding shares of common stock. These shares constituted all of Samuel Gellis's shares in the Company and part of the shares of Richard Gellis. The Company made the first two payments to its creditors on schedule. At the end of fiscal year 1972, however, the Company realized a negative worth of $2,649,662, which was no doubt attributable to the Company's inability to establish sufficient credit to satisfy its obligations as they matured. In the spring of 1973, it became apparent to the Committee that the Company would be unable to cure its negative net worth, make its next scheduled payment to creditors or obtain the necessary trade credit to operate profitably. In an effort to breathe new life into sagging business operations and to assure the repayments of extended debts the Creditors Committee on March 27, 1973, retained the defendants Finkelstein, operators of a similar business, as management consultants. It appears that the Committee's primary concern at this time was to avoid liquidation or bankruptcy of the Company by eventually transferring management control and substantial ownership to the Finkelsteins, who had given the Committee assurances that they could produce the essential trade credit. In an effort to make the transition harmonious, the Committee attempted to secure the consent of the Gellises to a "Second Extension Agreement" and "Stock Acquisition Agreement" whereby the debt of the Company would be reduced, the time for repayment extended and new shares issued to both the Finkelsteins and the Creditors which ultimately would represent 73 percent of the outstanding shares. For the consent of the Gellises, the Creditors offered to return the escrowed shares to them. They, however, refused.

Thus, on June 15, 1973, the Committee demanded that the Gellises cure the Company's negative net worth. The demand was not met. On June 18, 1973, the Second Extension Agreement and the Stock Acquisition Agreement were signed by the Chairman of the Creditors Committee, the President of the Company and the Finkelsteins. The Gellises were not signatories to these agreements. The Second Extension Agreement, by its terms, could not become effective until the closing of the Stock Acquisition Agreement, which in turn required *stockholder* and *Creditor* approval.[2] All rights or obligations of the Gellises and the Extending Creditors under the Original Extension Agreement were expressly reserved by the Second Extension Agreement.

On July 20, 1973, the Company failed to make its required payment to Creditors. Notice of default was delivered to the Company and to the Gellises and, in accordance with the terms of the Original Extension Agreement, the escrowed shares were transferred to the defendant George N. Friedlander as designee of the Creditors Committee. Notices of the annual meeting of stockholders and proxy statements were mailed to all stockholders of record on September 14, 1973, asking the stockholders to approve the Second Extension Agreement and Stock Acquisition Agreement, to approve an amendment to the Certificate of Incorporation for the purpose of increasing the amount of authorized common stock, and to elect seven directors. The stockholders annual meeting was held on September 28, 1973, at which time a majority of the stockholders approved the above agreements, authorized the requested increase in common stock,

---

2. The "Effective Date" of the Second Extension Agreement was the "Closing Date" set forth in the Stock Acquisition Agreement. The Finkelsteins' obligation to perform under these agreements was conditioned upon the approval of these agreements by 85 percent of the Extending Creditors (under the Original Extension Agreement) and the holders of 75 percent of the outstanding S. Gellis Co., Inc. stock.

and elected the individual defendants as directors of the Company.

However, Samuel and Richard Gellis personally attended the annual meeting and nominated their own slate in the election of directors. In addition to voting the 64,360 shares held of record by Richard and Kathryn Gellis in favor of the Gellis slate, Samuel and Richard Gellis attempted to vote the 277,338 shares previously placed in escrow under the Original Extension Agreement. Their attempt to vote these shares was disallowed on the ground that the Creditors' designee, George N. Friedlander, was the record owner of the shares. If these 277,338 shares had been counted for the nominees of the Gellises, the Gellis slate rather than the individual defendants would have been elected.

In reviewing a contested election under Section 225 of the General Corporation Law, the Court has occasionally been required to look behind mere record ownership of stock and reject the votes cast by the record owner where inequitable circumstances appear which make it improper for such votes to be cast. See, e. g., In re Giant Portland Cement Co., 26 Del.Ch. 32, 21 A.2d 697, 702 (1941); In re Canal Construction Co., 21 Del.Ch. 155, 182 A. 545, 547 (1936). Compare Ringling Bros.-Barnum & Bailey Com. Shows v. Ringling, Del.Supr., 29 Del.Ch. 610, 53 A.2d 441, 448 (1947).

Unquestionably, the legality of the election of the individual defendants depends on the right of defendant Friedlander to vote the disputed shares. This right, in turn, depends upon the propriety of the action taken by the Creditors Committee in transferring to him the 277,338 shares of common stock held in escrow under the Original Extension Agreement, and the va-

lidity of this action is necessarily dependent upon the occurrence of a default within the terms of that agreement. On this latter point the evidence clearly indicates that the Gellises were in default of the Original Extension Agreement as early as June 30, 1973, when the Company's negative net worth had not been timely cured[3] and no later than July 20, 1973, when a scheduled payment to the creditors was not made. Accordingly, the actions taken by the Creditors Committee after July 20, 1973, particularly in transferring the escrowed shares to defendant Friedlander would appear to be valid, and Friedlander's right to vote these shares at the annual meeting of stockholders would, *a fortiori*, appear to follow.

These facts notwithstanding, the Gellises contend that the execution of the Second Extension Agreement on June 18, 1973, without the consent of Samuel and Richard Gellis effectively released the shares from escrow, that the Creditors Committee could not thereafter transfer such shares to its designee, and that the 277,338 shares therefore should have been counted in favor of the Gellises' slate of nominees at the stockholders' annual election of directors. The date of the execution of the Second Extension Agreement is significant since the defaults under the Original Agreement did not mature until after June 18, 1973.

Their argument is based, in the first instance, on the premise that Samuel and Richard Gellis were voluntary sureties under the Original Extension Agreement by virtue of their pledge of the 277,338 shares of common stock. They assert that since the stock was pledged to secure the debt of the Company, for which the Gellises assumed liability of a surety, any material alteration in the Original Extension Agreement not assented to by them, discharged the shares

---

3. The plaintiffs have raised a question as to whether the Company's negative net worth for fiscal year 1972 was in fact attributable to them. They assert that the negative net worth of the Company only occurred after Samuel and Richard Gellis were discharged as officers and/or directors of the Company and, therefore, during the time when the Creditors Committee assumed active management of the Company. Consequently, the plaintiffs see no obligation on the part of Samuel and Richard Gellis to cure a negative net worth occasioned by the Creditors Committee's management of the Company.

from pledge and caused the ownership of such shares to revert immediately and absolutely to them.

■ Ordinarily, once an owner of property pledges it as security for the debt of another he is treated as occupying the position of a surety. Securities and Exchange Comm. v. H. L. Rodger & Brothers, 7th Cir., 444 F.2d 1077, 1080 (1971); Wurlitzer Company v. Oliver, W.D.Pa., 334 F.Supp. 1009, 1013 (1971); Thompson v. Metropolitan Bldg. Co., 95 Wash. 546, 164 P. 222, 224 (1917); Restatement of Security, § 36. And, where a pledge of stocks or other securities is made the security for the obligation of another, the pledgor is a surety to the extent of the stock pledged. Mallis v. Faraclas, Md.App., 235 Md. 109, 200 A.2d 676 (1964); Damler v. Baine, 114 Ind.App. 534, 51 N.E.2d 885 (1943).

In the instant case it appears that the Gellises were sureties to the. extent of the 277,338 shares pledged as security for the debts of the Company. Although the defendants assiduously maintain that the shares were demanded merely as a method of assuring the Creditors Committee the necessary voting control, in the event that such control became necessary, the fact remains that under the Original Extension Agreement the escrowed shares could, in the event of a default by the principal debtor, be used by the Creditors "to the satisfaction of all obligations of the Debtor [Gellis & Co., Inc.] under the agreement". Equally unpersuasive is defendants' argument that since Samuel Gellis was released under the Original Extension Agreement from personal liability on a $200,000 debt, he retained the consideration of the contract and therefore could not occupy a position of surety.

It is important to distinguish between voluntary and compensated sureties because the rules of suretyship differ with respect to each class. A voluntary surety is one whose surety contract is merely incidental to his other business and whose undertaking is primarily gratuitous, although he may receive some pecuniary advantage or benefit therefrom. A compensated surety, on the other hand, is ordinarily defined as one who is engaged in the business of executing surety contracts for an actuarially-computed premium. Restatement of Security, § 82, Comment (i); Atterbury v. Carpenter, 9th Cir., 321 F.2d 921, 924 (1963). However, there is also a well established line of cases which treats shareholders and directors who act as sureties for corporate debts as occupying the position of compensated sureties although the contract may in fact be an infrequent, even singular business affair. See, e. g., Holmes v. Elder, 170 Tenn. 257, 94 S.W.2d 390 (1936); In re Brock, 312 Pa. 7, 166 A. 778 (1933); In re Cancelmo's Estate, 308 Pa. 178, 162 A. 454 (1932); Matchett v. Winona Assembly and Summer School Ass'n, 185 Ind. 128, 113 N.E. 1 (1916); First Nat. Bank v. Livermore, 90 Kan. 395, 133 P. 734 (1913). The above rule rests upon the notion that a shareholder-director has a personal and direct pecuniary interest in the corporation whose obligations he is guaranteeing and affirmatively seeks a benefit for himself by promoting an enterprise in which he is inextricably associated. First Nat. Bank v. Livermore, *supra*; In re Cancelmo's Estate, *supra*.

■ I conclude that the Gellises became compensated sureties by virtue of the Original Extension Agreement. Samuel and Richard Gellis were not only shareholders, but also officers and directors of the Company whose debts they secured by the pledge of their stock. The Gellises had a direct pecuniary interest in the continuation of the Company's business operations which was made possible, in part, by their pledge of surety. This circumstance, coupled with the release of Samuel Gellis from a stated personal liability, renders such a finding inescapable.

■ Because the Gellises are compensated sureties, they are denied the benefit of the rule of *strictissimi juris* on which they rely. In re Brock, *supra;* In re Can-

celmo's Estate, *supra.* Hence, to be released from liability as sureties the Gellises must show that there has been an effective modification or alternation of the principal obligation (to which they did not consent) and that the modification or alteration is not only material, but also prejudicial. 72 C.J.S. Principal and Surety § 124c and d; United States v. United States Fidelity & G. Co., 178 F. 721 (D.C.1910).

■ Normally, an extension of time to the principal debtor is a material alteration of the surety contract which, if not consented to by the surety, discharges him from liability. Equitable Trust Co. v. Shaw, 22 Del.Ch. 47, 194 A. 24, 28 (1937). See also Germantown Trust Co. v. Emhardt, 321 Pa. 561, 184 A. 457, 459 (1936); Leavitt v. Youngstown Presssed Steel Co., 132 Me. 76, 166 A. 505, 506 (1933). However, to so release a surety, such an extension must be by a valid and enforceable contract, for otherwise there is no legally recognized variation in the undertaking of the surety. Germantown Trust Co. v. Emhardt, *supra.* See also M'Lemore v. Powell et al., 25 U.S. (12 Wheat.) 554, 6 L.Ed. 726 (1827); 50 Am.Jur., Suretyship, § 20; Restatement of Security, § 129, Comment C; 10 Williston, Contracts, § 1222 (2d Ed. 1967).

■ Disposition of the instant case, therefore, must turn on whether or not the Second Extension Agreement was one which produced a change in existing rights on June 18, 1973, the date on which it was signed by all interested participants except the Gellises. Defendants argue that the Second Extension Agreement lacked efficacy at the time it was executed because its effective date was contingent upon the occurrence of various conditions which could not take place until after the anticipated defaults had matured. Defendants further assert that the Second Extension Agreement was, at least on its execution date of June 18, 1973, unsupported by consideration, and hence, unenforceable. I am inclined to agree.

The Second Extension Agreement, when executed, did not thereby discharge the Gellises, as sureties, from their obligations (or their rights) under the Original Extension Agreement. The instrument was purely executory on that date, and, so long as the various conditions set forth remained unfulfilled, the rights and duties bargained for remained unborn. It is reasonably evident from a reading of the Second Extension Agreement that its enforceability was contingent upon the occurrence of several conditions. For example, before the agreement could become effective, approval by shareholders of 75 percent of the outstanding shares of Gellis & Co., Inc. and by 85 percent of the Extending Creditors for both the Second Extension Agreement and the Stock Acquisition Agreement was required. The agreement itself recognized that the requisite Creditor approval might not occur, thus preventing a potential effective date.

Secondly, the Agreement contained no words of present discharge of the obligations of the parties under the Original Extension Agreement. See State v. Northrop, 93 Conn. 558, 106 A. 504, 507 (1919). Instead, the rights and obligations of the parties under the Original Extension Agreement were to continue until the effective date of the Second Extension Agreement, which in turn might never occur. Finally, it is evident that the authorization and issuance of additional shares to the Finkelsteins and the Creditors was the consideration by the Company for the reduction of debt and extension of time. However, unless and until the Stock Acquisition Agreement was approved and the additional shares issued, no valid consideration supported the Second Extension Agreement. Consequently, as I view it, the Second Extension Agreement, when signed by Company, the Creditors Committee's designee and the Finkelsteins on June 18, 1973, was no more than a proposition, though a very definite one, to modify the terms of the Original Extension Agreement if certain subsequent conditions occurred. A "mere proposition to give time,

and suspend the right to sue, on certain conditions and contingencies, which are not proved to have been complied with, or to have happened, will not discharge the sureties". Bradford v. Union Trust Co., 242 Ky. 709, 47 S.W.2d 536, 538 (1932). See also United States v. Nicholl, 25 U.S. (12 Wheat.) 505, 6 L.Ed. 709 (1827); Regan v. Williams, 185 Mo. 620, 84 S.W. 959 (1905); Stroud v. Thomas, 139 Cal. 274, 72 P. 1008 (1903); Thorn v. Pinkham, 84 Me. 101, 24 A. 718 (1891); State v. Northrop, *supra*.

In summary, I feel that the label "Second Extension Agreement" is a misnomer when applied to the instrument prior to the annual shareholders meeting. Before that time it did not constitute an extension agreement per se, but rather an agreement to enter into further extension terms if two things happened, namely, (1) a default by the Company and the Gellises under the Original Extension Agreement and (2) approval thereafter of its terms and those of the related Stock Acquisition Agreement by a designated percentage of both the shareholders and the Creditors. As such, it did not alter the terms of the Original Extension Agreement, but rather was premised on a default under that agreement before it could become effective. Thus default under the Original Extension Agreement occurred after the Second Extension Agreement was executed, but before it became effective by its terms. Since at the time of its execution, and prior to stockholder and Creditor approval, it did not constitute an enforceable contract governing the rights of the parties, it in no way could have varied the obligations of the Gellises in their capacity as sureties for the Original Extension Agreement. Thus it could not have released the stock pledged by them as security prior to the time of default.

I am therefore of the opinion, on the strength of the present record, that the pledged shares were transferred properly to the defendant Friedlander pursuant to the terms of the Original Extension Agreement, and that he, as record owner, was the proper person to vote them at the annual meeting of shareholders.

The motion of the plaintiffs for summary judgment is denied. Counsel for defendants is directed to present the appropriate order, on notice.