588 P.2d 452

John Ivan ANDRUS, Jr. and Margie Mae Andrus, husband and wife, Plaintiffs-Respondents,

v.

ZION'S FIRST NATIONAL BANK OF OGDEN, a National Association and Carl Reed, Defendants-Appellants.

No. 12441.

Supreme Court of Idaho.

April 24, 1978.

On Rehearing Dec. 15, 1978.

Edward J. Berrett, of Merrill & Merrill, Pocatello, for defendants-appellants.

Ronald J. Jarman, Pocatello, for plaintiffs-respondents.

SHEPARD, Chief Justice.

This is an appeal from a judgment in favor of plaintiffs-respondents, John and Margie Andrus, holding that a mortgage on their farm was null and void. The judgment also denied defendant-appellant Zion's First National Bank's counterclaim and that of defendant-appellant Carl Reed for damages to his reputation. We affirm.

Andruses own a 1924-acre farm near Lava Hot Springs, Idaho, upon which they operated a Grade C dairy operation. Muirbrook Farms, Inc., owned and operated a

Grade A dairy operation at West Warren, Utah. In 1974 Muirbrook was in financial distress and had indebtedness of approximately $600,000 owed largely to Zion's First National Bank or companies who share with Zion's a common parent holding company.

In the spring of 1974, the Andruses joined a part of their operation with that of Muirbrook and moved stock and feed to Muirbrook's operation in Utah. That partial merger was the result of an oral informal joint venture agreement. After Zion's First National had refused Muirbrook's repeated requests for an additional loan needed by Muirbrook for operating expenses, Muirbrook then requested Andrus to pledge the Andrus farm to obtain the additional loan Muirbrook needed for refinancing from Zion's First National.

Carl Reed, Zion's loan officer, visited the Andrus farm in October of 1974, examined that property and the personal assets and advised Andrus that he had a sound operation. On November 21, 1974, Andrus, Muirbrook and Reed met in Pocatello, Idaho, at which time Reed agreed that Zion would make a $250,000 FHA guaranteed loan to Muirbrook which would require that the Andrus farm, without personal property, be used as collateral. The bank would first require that Andrus and Muirbrook formalize their joint venture agreement. Andrus was also informed that a "wrap around" arrangement would be made in which a large part of the loan proceeds would be used to provide additional security for indebtedness of approximately $600,000 that Muirbrook at that time already owed to the bank.

At that same meeting Reed also stated that if refinancing was not obtained, foreclosure on the Muirbrook property would be initiated the following day. Andrus also gained the impression that such foreclosure would include his farm. On that same date arrangements were made for title insurance, appraisals, the note and trust deed, the joint venture agreement and a letter indicating Andruses' agreement to place a second mortgage on their farm. Since Reed had brought a trust deed form instead of an appropriate mortgage form, a mortgage was not drawn and signed until the following day, November 22, 1974.

Zion's First National was aware that an FHA guaranteed loan was not eligible for the refinancing of present indebtedness unless the farming operation was to continue for an indefinite time and Reed indicated confidence in the future operations of the joint venture. Nevertheless, 45 days later the bank initiated foreclosure proceedings against Muirbrook. All of Muirbrook's assets were seized and foreclosure thereon was completed in 1975. In that process the bank also seized control of all of the Andrus property including cattle and feed.

It was the intention of Muirbrook and Andrus that the proceeds of the $250,000 loan would be used to refinance $200,000 of the indebtedness of Muirbrook which would leave $30,000 for operational expenses and $20,000 for Andrus. From the record it is questionable whether the $30,000 for the joint venture operation was received but it is clear that Andrus did not receive the $20,000. The bank placed the loan proceeds in a trust in the bank to be dispersed by the Andrus and Muirbrook attorney under the control of the bank. By some process not clear in the record, the bank assumed and seized control of the accounts receivable of the joint venture. The actions of the bank in establishing the trust account for the loan proceeds and in seizing control of the accounts receivable were not anticipated by Andrus or Muirbrook and came as a surprise to both of them. It is unquestioned that such procedures seriously hampered and aggravated the cash flow problems of the joint venture.

As a result of the above set out facts which were substantially found by the trial court, the court held that the Andruses had acted as a gratuitous surety in placing the second mortgage on their farm. It also held that both the bank and Reed had a duty to disclose the details of the loan program and the material facts affecting the surety's risk and that they failed to fulfill those duties. The trial court further held that the bank had engaged in misleading

conduct which was "inequitable and lacking in fair dealing." The court denied those damages sought by the Andruses for loss of profit on the basis that they had failed to meet their burden of proof. Thus, the Andruses were only awarded their court costs, including the $7,500 for attorney's fees. As aforesaid, the court also denied the counterclaims of both Zion's First National and Reed.

We deem the record to support the trial court's characterization of the relationship between the parties as a suretyship. The Andruses may not have intended to act as a *gratuitous* surety in the strict sense of the word when they entered into the agreement since they did expect to receive some benefit in the form of cash for operating expenses. Nevertheless the finding of the trial court, which is supported by the evidence, indicates that no cash for operating expenses was received. Here, the Andruses bargained for an amount not to exceed $50,000 in cash (which they did not receive) in return for mortgaging their property to guarantee the payment of approximately $600,000 of the then presently existing indebtedness of Muirbrook to the bank and its related companies.

There is no required form for a surety contract and it is not necessary that the mortgagors be labeled "surety" on the face of the contract. *United States v. Ferguson*, 409 F.Supp. 393 (S.D.Ga.1975) *aff'd*, 529 F.2d 999 (1976).

The requirement that a surety receive no benefit whatsoever in order to be characterized as a surety is no longer the rule. A. Stearns, The Law of Suretyship §§ 1.2, 2.1, at 2, 8–9 (5th ed. J. Elder 1951). Here, the ultimate effect of the transaction was that the Andruses mortgaged their property to secure the debts of another and hence, they are held to be a surety. *See SEC v. H. L. Rodger & Bro.*, 444 F.2d 1077 (1971); *Gellis v. Gellis & Co.*, 322 A.2d 287 (1974), *aff'd*, 339 A.2d 64 (Del.1975); *Mallis v. Faraclas*, 200 A.2d 676 (Md.1964); *Eichler v. Hillside Nat'l Bank*, 176 A.2d 508 (N.J. 1961); *Bank of New York, Albany v.*

*Hirschfeld*, 350 N.Y.S.2d 943 (1973); *Champlain Valley Fed. Sav. & Loan Ass'n v. Ladue*, 316 N.Y.S.2d 19 (1970); 72 C.J.S. *Principal and Surety* § 41 (1951). *See also* I.C. § 28–1–201. The decision of the trial court may be upheld on either of two theories. First the trial court found that the Andruses did not receive that which they had been promised in return for their execution of the mortgage-suretyship agreement, *i. e.*, the money for operating expenses. "Where the consideration for the surety's obligation fails, he is not liable thereon." 72 C.J.S. *Principal and Surety* § 70 (1951). *See also* A. Stearns, *supra*, § 7.4 at 204. Secondly, the trial court held that since the Andruses were acting as a surety the bank had a duty of disclosure which it failed to meet. *See Mohasco Indus., Inc. v. Giffen Indus.*, 335 F.Supp. 493 (S.D.N.Y.1971). Both parties cite and rely on *Sumitomo Bank of Calif. v. Iwasaki*, 70 Cal.2d 81, 73 Cal.Rptr. 564, 447 P.2d 956 (1968), which states:

"In all suretyship relations, the creditor owes to the surety a duty of continuous good faith and fair dealing. * * * "Thus the creditor must not misrepresent or conceal facts so as to induce or permit the surety to enter or continue in the relationship in reliance on a false impression as to the nature of the risk."

In the instant case the trial court held that the bank had obtained the mortgage from the Andruses "without adequate disclosures and engag[ed] in misleading conduct concerning the transaction [which was] were inequitable and lacking in fair dealing." The court also held that the facts were material and affected the risk of the surety. Those holdings and conclusions of the court are adequately supported by the findings of fact which in turn are supported by the evidence, albeit conflicting. It is sufficient to indicate that those findings relate to the disbursement of the $250,000 loan funds under the control of the bank, the assumption by the bank of control of the accounts receivable and the failure of the bank to furnish the agreed upon operating funds, although such were continually promised by Reed, the loan officer of the

bank. The trial court noted additional facts demonstrating the lack of "fair play" on the part of the bank although those facts were not necessary or material to its decision, i. e., that after default of Muirbrook the bank foreclosed on all assets including those of the Andruses without notice and without accounting for the proceeds or application of any surplus to the Andrus obligation.

The trial court applied and utilized correct principles of law relating to the duty of a creditor to disclose to a surety facts which would affect the risk assumed. *See United Bonding Ins. Co. v. Donaldson Eng'r, Inc.*, 222 So.2d 447, 448 (Fla.Ct.App.1969); *citing* 72 C.J.S. *Principal and Surety* § 77 (1951) (—Concealment); *State Bank of Albany v. McDonnell*, 40 A.D.2d 905, 337 N.Y.S.2d 697 (1972). *See also St. Charles Nat'l Bank v. Ford*, 349 N.E.2d 430 (Ill.App.Ct.1976); *Harris & Harris Constr. Co. v. Crain & Denbo, Inc.*, 123 S.E.2d 590 (N.C.1962); *United States v. Ohio Cas. Co.*, 399 F.2d 387, 389, *cert. denied*, 393 U.S. 1064, 89 S.Ct. 719, 21 L.Ed.2d 708 (1968).

The judgment of the trial court is affirmed. The trial court allowed costs to plaintiff which included $7,500 attorney's fee. That award of costs is likewise affirmed. Costs on appeal allowed to respondents; however, no attorney's fee on appeal is allowed.

McFADDEN, DONALDSON and BIST-LINE, JJ., concur.

BAKES, Justice, dissenting:

The majority's affirmance of the trial court's conclusion that the Andruses acted as a gratuitous surety in mortgaging their farm and that they can now escape liability based either upon a failure of consideration or upon the bank's breach of some duty of disclosure is clearly erroneous. In my view, the Andruses are bound, at least to the extent of their mortgaged property, as principals, although they may have some right of setoff attributable to the manner in which the bank disbursed the loan proceeds.

There are at least two bases upon which it can be shown that the trial court erred in characterizing the Andruses as a gratuitous surety. Both are premised upon the rule that one obligated to repay a loan is a principal, and not a surety, if the lender contracted to disburse the proceeds of the loan for the obligor's benefit. *See* A. Stearns, The Law of Suretyship § 1.4 (5th ed. J. Elder 1951).

In mortgaging their land, the Andruses obligated themselves to the extent of their property to repay a loan. To decide whether they were obligated as principals or as sureties, we must determine whether the lender agreed to disburse funds for their benefit. As the majority acknowledges, the Andruses and Muirbrook entered into a joint business venture in the spring of 1974. The trial court found that "[t]he . . . joint venture came in need of funds for their enterprise . . . [and] application was made by Muirbrook Farms, Inc., to the defendant Zion's First National Bank of Ogden for a loan in the amount of $250,-000." The court further found that the bank agreed to make the loan if the Andruses would secure it with a mortgage on their land in Idaho. The record before us contains a letter from the Andruses to the bank. It reads in part as follows:

"[We] hereby request that you make a loan of $250,000 to Muirbrook Farms, Inc. which loan is to be secured by a Second Mortgage on our farm. . . . [We] have a joint venture agreement with Muirbrook Farms, Inc. which is to be known as MACLAC, and our consideration for executing the mortgage . . . will be our participation in proceeds with Muirbrook Farms, Inc. in and through MACLAC joint venture."

It is clear from the foregoing that the Andruses agreed to mortgage their land in order to further the interests of the MAC-LAC joint venture. Muirbrook had an existing line of credit with the bank which was in default. The bank had refused to refinance Muirbrook without additional collateral, and all of the parties acknowledged that when the Andruses agreed to put up that collateral a substantial portion of the loan proceeds was earmarked for the refi-

**728**

nancing of Muirbrook's pre-existing indebtedness. As the majority acknowledges, Muirbrook's own solvency was imperiled, and the Andruses certainly understood that MACLAC's future was inseparable from Muirbrook's. Thus, as the Andruses stated in their letter, funds disbursed for Muirbrook's benefit likewise inured to the Andruses' benefit, since the Andruses had a direct interest in ensuring MACLAC's continued operation. This alone is reason enough to conclude that the Andruses received a benefit from the refinancing and thus were principals.

However, there is a more compelling reason that both the trial court and now the majority have erred in casting the Andruses as sureties. The trial court found that the bank led the Andruses to believe that $20,000 of the loan proceeds would be placed at their disposal as operating capital for the MACLAC joint venture. Although the bank executed no writing to that effect, the majority uncritically accepts the trial court's finding.[1] Yet, even while it posits that the Andruses bargained to receive $20,000 in cash from the proceeds of the loan, the majority clings to its view that the

Andruses were gratuitous sureties—obviously two inconsistent positions. As indicated earlier, one who bargains and obligates himself to repay a loan is a principal and not a surety, if the lender contracted to disburse the proceeds of the loan for the obligor's benefit. *See* A. Stearns, *supra,* § 1.4. The majority's affirmance of the trial court's conclusion that the Andruses were gratuitous sureties, and its simultaneous affirmance of the finding that the bank never paid the Andruses the $20,000 that it allegedly agreed to pay out of the loan proceeds, are two totally inconsistent positions which cannot be reconciled.

Both the majority and the trial court have made much of the fact that the bank apparently did not tender $20,000 directly to the Andruses or directly to MACLAC. The trial court seems to have believed that the bank breached a duty of disclosure that it owed to the Andruses in their capacity as gratuitous sureties by failing to advise them that it would not place $20,000 at their immediate disposal. As has been demonstrated above, the Andruses were not sureties at all, gratuitous or otherwise,[2] and

1. The finding is open to criticism for at least two reasons. First, the trial court's finding seems to be premised upon the written joint venture agreement between the Andruses and Muirbrook which referred to a $20,000 contribution to the venture by Muirbrook. The court found that the bank had approved of the joint venture agreement, knowing that Muirbrook's only source of cash would be the loan proceeds; that the Andruses "had a right to rely upon the reference to the $20,000 contained in the joint venture agreement"; and that "[t]he basic consideration for [the Andruses'] execution of the mortgage was their belief that they would receive immediately upon execution of the documents $20,000 from the loan proceeds for their operational expenses." In my view, the bank's familiarity with the terms of the Andrus-Muirbrook joint venture agreement and with *Muirbrook's financial status is not a suit*able basis for inferring that the bank was somehow obliged to see to it that the Andruses or MACLAC would get $20,000 from the loan proceeds.

A further difficulty with the trial court's finding is that the court seemed to equivocate regarding the exact nature of the expectancy to which the bank's conduct allegedly gave rise. For example, at one point the court indicated that the bank "led [the Andruses] . . . to believe that [$20,000] would, in fact, be depos-

ited to the joint venture operating account." However, the court also found that the Andruses "never received any part of the $20,000." This suggests that the court was not really clear whether the funds were to be delivered to the Andruses personally or placed in a joint venture account. The majority seems to assume that the money was to go directly to the Andruses, though this is inconsistent with the Andruses' letter to the bank indicating that they would "participat[e] in proceeds . . . in and through *MACLAC joint venture.*" (Emphasis supplied).

2. The trial court's conclusion that the Andruses acted as a *gratuitous* surety is particularly perplexing in light of the court's own finding that they were to receive $20,000 of the loan proceeds, which surely must mean that they were to receive consideration for mortgaging their land. That they might not have subsequently received the promised money in hand should have no bearing upon the gratuitousness of their contribution to the procurement of the loan. The bank's failure to deliver the promised $20,000 would constitute, at most, a breach of the agreement, for which damages would be an adequate remedy. The majority's discussion of this problem is murky and appears to endorse the trial court's faulty reasoning with respect to the issue of gratuitousness.

therefore the bank owed them no special duty of disclosure.

Furthermore, it cannot be said on the record before us that the bank is guilty of fraud. The trial court concluded that the bank misled the Andruses concerning the $20,000. However, the court did *not* specifically find that the bank was aware that no funds would be disbursed directly to the Andruses or MACLAC but nevertheless told the Andruses otherwise in order to induce them to mortgage their land. In general, there is no fraud if the one making a representation believes it to be true at the time it is made. *See Fowler v. Uezzell*, 94 Idaho 951, 500 P.2d 852 (1972). "In Idaho, fraud is not to be presumed, but rather must be shown by clear and convincing evidence." *Gneiting v. Clement*, 96 Idaho 348, 350, 528 P.2d 1283, 1285 (1974). Thus, standing alone, the trial court's conclusion that the bank misled the Andruses regarding the $20,000 is not sufficient to establish that the Andruses were defrauded.

The majority has held that the bank's failure to tender to the Andruses the $20,000 cash that it had allegedly promised them constituted a failure of consideration, precluding the bank from looking to the Andrus land to satisfy Muirbrook's unpaid promissory note. However, it is undisputed that the bank actually did disburse the entire $250,000 it had agreed to lend. Much of this money apparently went to refinance Muirbrook's pre-existing indebtedness as the parties agreed would be done. As explained earlier, consideration to Muirbrook was also consideration to the Andruses. Furthermore, the record discloses that some of the loan proceeds were used to meet current expenses of the MACLAC joint venture and some was used to pay the debts incurred by the Andruses. The trial court failed to make detailed findings regarding the source of the obligations for the satisfaction of which the loan proceeds were disbursed. The court simply found that the Andruses "never received . . . any funds from the loan proceeds." However, unless we are to limit receipt of funds to the placing of cash into the recipient's hand or bank account, John Andrus's own testimony shows that this finding was clearly erroneous:

"Q. [By Mr. Barrett] Were you familiar with the fact that your payment to the Federal Land Bank is paid from the proceeds of this loan?

"A. Yes. . . .

.   .   .   .   .

"Q. Was the payment made to Mr. Russell Hebdon on your behalf?

.   .   .   .   .

"A. The payment was made to Mr. Russell Hebdon on my behalf [and] was [for] feed that we bought from Mr. Russell Hebdon for the operation of the [joint venture] along in the fall of the year.

"Q. Was a payment made to Mr. J. Harper for your account?

"A. Yes."

Thus, although the borrowed funds were not disbursed directly to Andrus, a portion of the loan proceeds were paid directly to his creditors for his benefit. Hence, there was no complete failure of consideration sufficient to relieve the Andruses of the consequences of mortgaging their land.

At most the Andruses might be entitled to some amount of setoff for damages they are able to prove. It is certainly not a foregone conclusion that they should be entitled to set off the full amount that the bank failed to make directly available to them or MACLAC. It seems that the bank's failure to disburse the funds in that manner was attributable to the fact that the entire $250,000 was expended in refinancing part of Muirbrook's existing indebtedness and in paying the expenses of Andrus and the joint venture. Thus, even if the bank had tendered the $20,000 directly to them, it is quite conceivable that the money ultimately would have gone to the same creditors who in fact received it, albeit by way of an extra set of hands.

I would reverse the judgment of the trial court and remand the matter for a new trial.

ON PETITION FOR REHEARING

SHEPARD, Chief Justice.

The petition for rehearing in the above entitled action was granted and reargued. The Court has reviewed the record, considered the arguments presented by counsel, and continues to adhere to the views expressed and the conclusion reached in our earlier opinions, together with the following and additional opinions.

McFADDEN and DONALDSON, JJ., concur.

BISTLINE, Justice, concurring in the result:

The rehearing has not changed my view that the trial court correctly decided the controversy in favor of respondents Andrus. On rehearing, the argument centered largely on the gratuitous or non-gratuitous surety issue. After hearing argument for the second time, and with the benefit of additional briefing, I am convinced more firmly that the suretyship was gratuitous. Andrus may have had expectations of benefits which might flow to him indirectly from the salvage of the Muirbrook operation by a new loan, but I cannot see that Andrus obtained any enforceable claim whatever as a result of the loan made by Zion's First National Bank to Muirbrook Farms.

BAKES, Justice, dissenting:

The briefs and arguments on rehearing further pointed out that the majority opinion is manifestly in error. On rehearing it was brought to the Court's attention that the statement in the majority opinion that Andrus, "also gained the impression that such foreclosure would include his farm," *ante* at 725, 588 P.2d 453, because of Reed's mention of a possible foreclosure of Muirbrook's property in 1974 is not supported by the record and is simply incorrect. Thus, not only is the majority opinion based on a misapprehension of the law, but is also based on a substantial misunderstanding of the facts.