822 F.2d 55
 56 USLW 2041, RICO Bus.Disp.Guide 6668
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
GATOIL (U.S.A.), INC., a Delaware Corporation, Plaintiff-Appellant,
v.
FOREST HILL STATE BANK; Stanley M. Naples; Texas National
Energy & Refining Co.; W. Arthur Benson; C.B. White, Inc.,
a Maryland Corporation; Benson & Associates, a Maryland
General Partnership, Defendant-Appellee,
and
Gloria BENSON, Defendant,
v.
VAN OIL U.S.A., INC.; Fleet Supplies, Inc., Third Party Defendant.
 No. 86-3579.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 2, 1987.
Decided June 17, 1987.
 
 Before WINTER, Chief Judge, CHAPMAN, Circuit Judge, and SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation.
 Donald N. Rothman; Susan Souder (Gordon, Feinblatt, Rothman, Hoffberger & Hollander; Dempsey J. Prappas; Prappas, Moncure & Eidman, on brief), for appellant.
 Frank Murray Benson, Jr. (Rob Ross Hendrickson); Boyd, Benson & Hendrickson); Nell Berelson Strachan (Francis S. Brocato; Brocato, Schwartz & Keelty, on brief), for appellees.
 CHAPMAN, Circuit Judge:
 
 
 1
 This appeal arises from four allegedly unauthorized wire transfers made by Forest Hill State Bank (Forest Hill) from the account of Gatoil (U.S.A.), Inc. (Gatoil) during a two week period in 1983. Gatoil has sued Forest Hill for damages based upon a duty which the bank allegedly breached in making the wire transfers without authorization. Gatoil has added a cause of action under the Racketeer Influenced and Corrupt Organization statute, 18 U.S.C.A. Sec. 1961 et seq. (1982 and Supp.1987) (RICO) against Forest Hill and a battery of related parties based upon the allegedly unauthorized wire transfers. Because there has been no showing of damages from the transfer involved, we affirm the district court's grant of partial summary judgment in favor of Forest Hill as to one of the transfers. In addition, because the facts do not demonstrate that a "pattern of racketeering activity" as defined by 18 U.S.C.A. Sec. 1961(5) exists, we affirm the district court's order granting judgment on the pleadings against Gatoil.
 
 I.
 
 2
 Forest Hill is a state chartered general banking institution located in Forest Hill, Maryland. Gatoil, a Delaware corporation with its principal place of business in Houston, Texas, is a wholly owned subsidiary of Contas International, N.V. of Geneva, Switzerland.
 
 
 3
 In early 1983 Gatoil entered into a joint venture with the Texas National Energy and Refining Company (TNER). TNER was formed by one Stanley Naples, a Houston resident, who owned all its stock. The purpose of the joint venture was to profit from bulk transactions in petroleum products. Under the joint venture agreement, Gatoil was to provide financing to purchase refined oil products, and TNER was to sell these products in the Baltimore, Maryland area.
 
 
 4
 Under the agreement, all sale proceeds were to be deposited in Gatoil's accounts, and all purchases were to be made by Gatoil. TNER was to provide proper accounting of all transactions and the profits were to be divided equally. On February 22, 1983, in order to control all receipts and disbursements relative to the joint venture, Gatoil established a checking account at Forest Hill State Bank. Bank records show that the signature card used to designate persons who may authorize transactions in the account listed only Harry A. Jones and Geneva E. Bond, corporate officers of Gatoil.
 
 
 5
 Early in the history of the joint venture, in order to obtain a supply of oil for TNER to sell, Gatoil in its role as financier entered into an exchange agreement with Exxon. In this agreement, Exxon agreed to deliver 100,000 barrels of oil to Gatoil at Baltimore harbor between January 28, 1983 and February 28, 1983. In exchange, Gatoil agreed to deliver one hundred thousand barrels of oil to Exxon in New York harbor between February 1 and February 28, 1983.
 
 
 6
 Gatoil's obligation to deliver oil to Exxon was secured by letter of credit obtained by Gatoil from the Texas Commerce Bank. The letter of credit was for 2.5 million dollars, payable to Exxon. In order to draw against the letter, Exxon needed only to certify that Gatoil had failed to redeliver the oil on a timely basis, and certify the then-prevailing price of oil. If the letter was so called, the Texas Commerce Bank would be obligated to deliver funds in the certified amount to Exxon, charging Gatoil for the amount of funds delivered. Pursuant to the exchange agreement, Exxon delivered oil to the joint venture in Baltimore. Gatoil partially fulfilled its obligation to deliver oil to Exxon in New York. Although Exxon apparently acquiesced in allowing Gatoil additional time, by April it was pressing for prompt completion of the deliveries.
 
 
 7
 In April of 1983, Mr. Naples of TNER requested that four transfers be made from the Gatoil account at Forest Hill. The bank officer who received the request did not attempt to verify Naples' authority over the Gatoil account, nor did he seek any confirmation of these transfers from Gatoil. The transfers occasioned by Naples are as follows: (1) an April 11, 1983 transfer of $73,750 to Fleet Supplies, (2) an April 15, 1983 transfer of $55,260 to Fleet Supplies, (3) an April 19, 1983 transfer of $30,000 to TNER, and (4) an April 27, 1983 transfer of $646,000 to Vanol (U.S.A.), Inc.
 
 
 8
 The two transfers to Fleet Supplies pertained to joint venture oil transactions. The $646,000 transfer to Vanol was made pursuant to a contract made by TNER to purchase 25,000 barrels of oil from Vanol for delivery to Exxon in New York Harbor pursuant to the exchange agreement between Gatoil and Exxon. Prepayment of the purchase price of $785,925 was required. Payment was accomplished as follows: $646,000 was wired from the Gatoil account at Forest Hill (the allegedly unauthorized transfer at issue), $120,925 was wired from the Gatoil account at Texas Commerce Bank in Houston, and $19,000 was wired from the TNER account at Forest Hill. Upon receipt of payment, and at TNER's direction, Vanol delivered 25,000 barrels of oil to Exxon.
 
 
 9
 The Vanol delivery resulted in a pro tanto reduction of the amount of oil owed Exxon by Gatoil. Exxon never called the $2.5 million letter of credit. Eventually, Gatoil's remaining obligation to Exxon was settled through a payment by the former to the latter for the remaining oil owed. Gatoil does not contend that the Vanol delivery to Exxon was wrongful, but argues that the transfer of money by Forest Hill to Vanol was unauthorized and wrongful.
 
 
 10
 Gatoil filed its complaint against Forest Hill in March 1984 alleging injuries stemming from the four allegedly unauthorized wire transfers. In January 1985, Gatoil filed an amended complaint joining as defendants Naples, TNER, and TNER president Arthur Benson, as well as C.B. White, Inc., and Benson and Associates, two companies with interests which were interrelated with Gatoil's business relationship with TNER. Gatoil argues that after the four transfers, it continued to deal with TNER, Naples, Benson, and the two defendant companies, and it would not have done so had it known of the transfers. Later, Gatoil amended its complaint to add a RICO claim against all defendants, alleging against Naples a violation of 18 U.S.C.A. Sec. 1962(c) (1984), and alleging against Naples and the other defendants violations of 18 U.S.C.A. Sec. 1962(a), (b) and (d) (1984).
 
 
 11
 After discovery was completed, Forest Hill moved for partial summary judgment alleging that even if the transfers were unauthorized, Gatoil could not claim damages for the $646,000 transfer to Vanol because the transfer had satisfied Gatoil's obligation to Exxon. The trial court granted this motion. Subsequently, the RICO defendants moved for judgment on the pleadings. The trial court held that Gatoil had failed to sufficiently plead a "pattern of racketeering activity" as required for each RICO cause of action. The trial judge held that the facts as pled indicated that this defect could not be cured by an amendment of the pleadings. The district court directed entry of judgment pursuant to Fed.R.Civ.P. 54(b) so that the decision granting partial summary judgment in the one wire transfer claim and the decision granting the motion for judgment on the pleadings in the RICO claims would be immediately appealable.
 
 II.
 
 12
 A wrong without attendant harm is not compensable in Maryland except by nominal damages. Mallis v. Faraclas, 235 Md. 109, 200 A.2d 676 (1964). Thus, the district court was correct in granting a partial summary judgment against Gatoil on the $646,000 transfer to Vanol. Even assuming that the transfer itself was unauthorized, the oil purchased with the transferred funds was delivered in Gatoil's name, accepted by Exxon, and credited by Exxon to the Gatoil exchange agreement. Gatoil has never disowned or renounced this delivery; rather, it has steadfastly accepted this benefit.
 
 
 13
 The damages for failure to exercise ordinary care in the handling of an item, here a wire transfer, by a bank is the amount of the item reduced only by an amount which could not have been realized by the use of ordinary care. Md.Com.Law Code Ann. Sec. 4-103(5) (1975).[1] Implicit in the statute is the assumption that the party wronged by a bank's breach of its duty of ordinary care has suffered some injury. As pointed out in the official comments contained in the Maryland Code, before the damage rule of the subsection becomes operative, liability of the bank and some loss to the customer or owner must be established. Md.Com.Law Code Ann. Sec. 4-103(5) comment 6 (1975). Because Gatoil can show no loss, the grant of partial summary judgment was correct, even assuming the wire transfer to Vanol was unauthorized.
 
 
 14
 Gatoil also contends that the district court erred in refusing to allow it to amend its complaint to allege a claim for consequential damages. Given the absence of actual damages, as well as complete lack of showing of the requisite bad faith required for an award of consequential damages under Md.Com.Law Sec. 4-103(5) this contention is meritless.
 
 III.
 
 15
 Gatoil contests the trial court's ruling that the four allegedly unauthorized wire transfers made in April 1983 were not sufficient to constitute a "pattern of racketeering activity" under RICO. Gatoil has pled claims against the various defendants under 18 U.S.C.A. Sec. 1962(a), (b), (c), and (d). Each of these subsections requires the plaintiff to prove that its injury arose from a "pattern of racketeering activity." We affirm the trial court's holding that the four allegedly unauthorized wire transfers involved are insufficient to form a "pattern of racketeering activity".
 
 
 16
 A "racketeering activity" is defined under 18 U.S.C.A. Sec. 1961(1)(b) (Supp.1987) to include wire fraud as defined under 18 U.S.C.A. Sec. 1343 (1984).
 
 According to the RICO Act:
 
 17
 [a] "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;.
 
 
 18
 18 U.S.C.A. Sec. 1961(5) (1984) (emphasis added).
 
 
 19
 While the statute requires at least two acts of racketeering activity to form a pattern, it does not deem a pattern to exist each time two acts of racketeering activity have occurred. The Supreme Court briefly expressed its conception of a "pattern of racketeering activity" in Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275 (1985). There, the Court stated that:
 
 
 20
 As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in Sec. 1961 in that it states that a pattern "requires at least two acts of racketeering activity," Sec. 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern." S.Rep. No. 91-617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). See also id., at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. Sec. 3575(e). This language may be useful in interpreting other sections of the Act. Cf. Iannelli v. United States, 420 U.S. 770, 789, (1975).
 
 
 21
 473 U.S. at ----, 105 S.Ct. at 3285, n. 14.
 
 
 22
 In addition, Justice Powell elaborated upon the interpretation of "pattern of racketeering activity" in his dissent, where he stated that:
 
 
 23
 [T]he requirement in the statute of proof of a "pattern" of racketeering activity may be interpreted narrowly. Section 1962(5), defining "pattern of racketeering activity," states that such a "pattern requires at least two acts of racketeering activity." This contrasts with the definition of "racketeering activity" in Sec. 1961(1), stating that such activity "means" any of a number of acts. The definition of "pattern" may thus logically be interpreted as meaning that the presence of the predicate acts is only the beginning: something more is required for a "pattern" to be proved. The ABA Report concurs in this view. It argues persuasively that "[t]he 'pattern' element of the statute was designed to limit its application to planned, ongoing, continuing crime as opposed to sporadic, unrelated, isolated criminal episodes." ABA Report, at 72, such as the criminal acts alleged in the cases before us today.
 
 
 24
 ... The ABA Report suggests that to effectuate this legislative intent, "pattern" should be interpreted as requiring that (i) the racketeering acts be related to each other, (ii) they be part of some common scheme, and (iii) some sort of continuity between the acts or a threat of continuing criminal activity must be shown. ABA Report, at 193-208. By construing "pattern" to focus on the manner in which the crime was perpetrated, courts could go a long way toward limiting the reach of the statute to its intended target--organized crime."
 
 
 25
 473 U.S. at ----, 105 S.Ct. at 3289-90 (Powell, J. dissenting).
 
 
 26
 As this court recently held in International Data Bank, Ltd. v. Zepkin, 812 F.2d 149 (4th Cir.1987), it is unreasonably generous to assume that Congress intended that any two predicate acts by a party be sufficient to prove a pattern of racketeering activity. So broad a reading brings virtually any series of criminal acts beneath the long shadow of RICO. The RICO statute was intended by Congress to provide adequate means to curb the influence of organized crime in the United States. The intent of Congress is not that RICO be used under all circumstances. Its intent is that RICO be used against racketeers, individuals who earn their livelihood through the repetitive and continuous commission of criminal acts. The statute, properly read, is not a "catch-all," but is instead a powerful tool to be used against racketeers and organized crime. Too frequently, this statute is used by attorneys against legitimate businesses when the attorneys are more concerned with the possible recovery of treble damages and attorneys fees than with the proper use of RICO.
 
 
 27
 In International Data Bank, Ltd. v. Zepkin, 812 F.2d at 154-155, this court held that several fraudulent acts alleged as part of a single, limited scheme to defraud do not amount to a "pattern of racketeering activity" absent a showing that such acts are part of a continuous criminal endeavor.
 
 
 28
 The case sub judice consists of four allegations of wire fraud which, read in the light most favorable to appellants, would comprise at most one criminal episode. It was neither continuing nor open-ended. The acts complained of all took place within one two week period. They were aimed at one victim. While all four acts are related, they do not satisfy the continuity requirement set out by this court in International Data Bank, Ltd. v. Zepkin.
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 This subsection in its entirety states:
 (5) The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence. (An.Code 1957, art. 95B, Sec. 4-103; 1975, ch. 49 Sec. 2.) Md.Com.Law Ann. Sec. 4-103(5) (1975).